Good morning, may it please the court. My name is Chad Carlock representing the appellants the Arc of California and UCP of San Diego. We have much to discuss today so I'd like to reserve 12 minutes of my time for rebuttal. I want to start by emphasizing the three primary points which bring us before you this morning. This is the appeal of the denial of a preliminary injunction. I suspect on that but primarily the legal question before this court is whether Section 30A applies to all of the Medicaid program or only to most of the Medicaid program. The State has taken the position in this case. Can I just say that you need to do this now but at some point we need to hear about a mootness problem at least with regard to the fee cuts. I understand that there are other provisions, that is the holidays and the time calculation, but with regard to the fee cuts, I gather that right now there are no fee cuts. Is that right? The percentage reduction has in fact sunsetted, yes. So why doesn't it make those claims moot? Well, there were in fact three different enactments, maybe four, over the course of a three-year period involving that percentage reduction. But in terms of an injunction, why doesn't it make it moot? Right. With respect to the mootness question and an injunction, one of the bases for relief that we are seeking is a prospective injunction that the State must comply with 30A in enacting any future reductions, which would include a percentage reduction. So we're on a preliminary injunction now, and in terms of irreparable harm, it seems to me you have a real problem. So the real question to me isn't so much that, but it was also dismissed, right? Yes, that's right. And you're arguing that we can reach the dismissal because of the overlap, but there may be a whole lot less overlap if we think that for preliminary injunction purposes, the percentage cuts are don't exhibit irreparable harm, and I don't see how they could possibly could. Well, with respect to the percentage injunctions, without an injunction in place, there's nothing to stop the State in this year's budget from enacting a new percentage reduction. Right. And then you'll come in, you'll go back in, and you'll be back here very fast. But that's – but there's still not irreparable harm now. Well, that brings us to the capable of repetition yet evading review exception. Well, that all goes to the dismissal, but I don't see how it goes to the preliminary injunction. Well, the – with respect to the preliminary injunction and the dismissal, in fact, the Court has, in Page v. California, revisited a dismissal of an injunction or, in the context of an injunction, revisited the underlying claim. A preliminary injunction? Yes, on a preliminary injunction. I believe Page v. California involved the appeal of a – of the granting of an injunction as opposed to a denial. But the injunction itself is based both on the 30A claim as well as claims under the ADA and the Rehab Act that the percentage reductions and the other two, the mandatory holidays and the half-day billing rules, which have no sunsets and are still being implied today, violated 30A. Why don't you turn to that argument? Sure. The – in terms of the violation that is alleged of 30A and the claims under the ADA and the Rehab Act are that these payment reductions were enacted without prior Federal approval, subsequent Federal approval, or any Federal approval, and that under the Medicaid Act, any changes to the payment levels, any changes to State law that affect payments made under the Medicaid Act must be submitted by way of the State plan amendment process. That's the whole purpose of the State plan amendment process, so that the State, before it even submits the State plan amendment, has to analyze the Section 30A factors. And by submitting that State plan amendment, they are representing to CMS that they have studied the potential impacts of the cuts and that they find that there won't be a detrimental impact. Well, does your argument depend on the orthopedic case still being entitled to Section 30A? I don't think it does, actually. No, it doesn't. Because they have to do something with Section 30A. That's right. They have to do what orthopedic said or not something. There's been a string of cases since orthopedic. Every case this Court has heard, whether they've granted Chevron deference or not, and in some cases, in fact, the most recent case of 2013, this Court did not grant Chevron deference. Which case was that? That was the rural home care case from 2013. There, in fact, was a State plan amendment in that case that was approved by CMS. And this Court not only did not defer to that determination, it found that based on the plain language of the Medicaid Act, the changes that the State wanted to make, they were trying to eliminate services. And under the Medicaid Act, those services were clearly included and had to be included within the State plan. So there was no, CMS had no discretion to give the State permission to not follow the Medicaid Act. That's a similar situation to what we're looking at here. The waiver statute is clear that there are only three items that are waived. Compliance with 30A is not one of the three items that is waived. The HCBS waiver program is subject to all of the Medicaid Act. It is part of the Medicaid Act. The very reason that the waiver was added into the Medicaid program was to bring these disabled consumers who otherwise would be at risk of institutionalization in to the Medicaid program. Do we have the State plan as such in the record, the currently applicable general Medicare Cal State plan? Well, there is a State law requires a State plan for disabilities. Right. What the State relies on in this case is its application for the waiver. I understand that. But I'm asking whether there is also a State plan document. There is a State plan for developmental disabilities, which is supposed to include things like compensation and the services that they provide. I think the question is, is it in the record? No, it is not in the record. The only thing that is in the record is the application. But it presumably would be judicially noticeable since it's a public document? Yes, it is. Yes, it is. And, in fact, the Lanterman Act does require a State plan for developmental disabilities. They call it a State plan. So it certainly is reasonable to assume that if the State were to be changing things that were contained in that State plan, a State plan amendment would be something that should be submitted to CMS for review. So are you ultimately relying on simply the lack, the fact that nothing was submitted and that's it and we can go home under managed pharmacy and so on, or that there was no – in which case we wouldn't even have to – well, we'd only have to answer the Section 30 question, you know, at the most general level, i.e., whether Section 30 is not covered at all and that's it? Or are you saying, and they didn't do anything anyway? Well, that's true. There are two parts of it. The first part is the State has been very clear in the record and there's about ten citations to it at various places in the record where they have taken the position that 30A doesn't apply, they don't have to do any studies, they don't have to notify CMS, they don't have to get CMS approval. But more than that, they don't have to collect any information about the relationship about costs at all. And they have not. And they don't have any. That is correct. They have no data and have not had for many years. So under this Court's 30-year-old line of cases with orthopedic and before and subsequently, all the cases have made clear that the State has to do something to show compliance with 30A. And in this case, they've done nothing. These three cuts in particular are therefore invalid and cannot be enforced. That's the first part of what we're asking for in terms of the injunction. We only have two cuts. I mean, at this point that are operative. Right. Well, and the second, which brings us back to the second point of the injunction, which is a prospective injunction instructing the State to comply with 30A prior to re-implementing these cuts or any new cuts. Which would be covered as to the two cuts. Now, the only thing the State says about the two cuts, the two that are operative, is some general vague thing about they're not within the Medi-Cal or within Medicaid. I don't really know what that means, but perhaps you want to comment on it. Right. I didn't really follow that as much of an argument. The percentage cut was also in State law. The whole point of the Supremacy Clause review is that it's to review State enactments that violate Federal law. And in this case, the State's obligations under the Medicaid Act and the ADA and the Rehab Act. So I don't think that argument really gets the State anywhere. You're down to about ten minutes. Do you want to reserve? I'll reserve. Thank you. Good morning, Your Honors. May it please the Court. My name is Rebecca Armstrong, and I represent the appellees, the California Department of Developmental Services and the Department of Health Care Services. California's legislature has already provided the relief that appellants seek. The rate reductions, as this Court has aptly noted, have sunset and expired by their own terms. There is no additional relief this Court can provide as a trial court. What about the other two cuts that are complained about in their complaint? The other two measures are the half-day billing rule and the uniform holiday schedule. And to directly address, I believe the other two. Well, you would concede that there's been no legislation that addresses those two items, true? That's correct. Okay. They are still enacted. And the record makes clear that they are, in effect, cuts. I mean, if you're not paying people for – you're not paying people for a number of days a year and they still have the obligation to provide the services, then they've been cut. These measures have acted to – with respect to the uniform holiday schedule, for example. That measure has been implemented in order to provide uniformity and consistency. For example, some – But it's still a cut. Correct. The regional centers vary between which holidays they recognize as not being paid. And so the purpose of that statute was to ensure – But we have a record from particular providers saying what the cost of that is to them, and it's substantial. Because they still have to provide the services. I believe that the record shows there is no causal connection between any of the alleged harm and specifically with the half-day billing rule and the uniform holiday schedule. Any of the harm that has been alleged has related to the percentage reduction. That's not true in terms of the – what's in the affidavit, the declarations there. I mean, it's discussed – they're each discussed repeatedly. There are numbers put on them. And the providers say that this is a substantial economic detriment to them, which is in danger. I mean, so why are you saying that? The primary facts that plaintiffs' requested relief are based on relate to the percentage reductions. The totality of what they're asking for relates to the percentage reductions. Those are no longer in effect. And to answer your question specifically, Your Honor, the half-day billing rule and the uniform holiday schedule are outside the scope of the Medicaid Act. Because – What does that mean? I don't even know what that means. It means that to the extent the plaintiffs allege that we were required to inform CMS of these measures, they are not implicated in the Medicaid Act, and therefore the State was not required to provide the information to them because they relate to matters of State operations over regional centers. So because – But they relate to what people are going to be paid for the services they're providing. That's directly what they relate to. But they are not implicated in any way in the HCBS waiver. What the State is required to do under the waiver is any time there is a change in the approved waiver, then the State is required to submit a waiver amendment. Again, this is separate and apart from a SPA. I mean, is this now morphing over into your position that Section 30 isn't – no Section 30 compliance is required, period? CMS has answered that question. And in this circumstance – Really? Where? In the fact that there is a separate framework for the HCBS waiver as opposed to what is required under the State plan. And if you look at the language – Yes, and it's waiving three things. But other than that, that's all it's doing is just waiving three things, three provisions, and Section 30 isn't one of them. That is correct. However, when you look at – there are two separate sections here. 1396a governs the State plan, and it starts with a State plan must, with an entire framework lined out for it. The same also applies under a separate section for 1396nc1, which is where we are at with this waiver. All right. And it says you can apply for a waiver of three sections, and Section 30 isn't one of them. So Section 30 is still – therefore, in order to get money for this provision, you still have to comply with Section 30. Why isn't that simply the structure of the statute? The structure of the statute simply doesn't require specific compliance with 30a. All right. What about everything else, then? What about 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, up to 30? You don't have to comply with any of it? No, Your Honor. CMS has specifically delineated the framework for what any State has to comply with in order to obtain an approved waiver. Right. And it is separate and apart from the State plan. Okay. And what's the waiver? The waiver is under 36nc1. Okay. But what is it? When you get the waiver, what do you have? You have the opportunity for – so both the State plan and the HCBS waiver fall under the Medicaid Act, which, as you know, is a very broad, wide-ranging Right. And when you get the waiver, you have a waiver of certain provisions. That's all you have. And you also have the opportunity for States to provide for medical services and other sorts of services. So your position is 1, 2, 3, 4, 5, 6, all of those, and everything after 30, are all not required for an HBCS waiver? My position is that CMS has specifically delineated what is required. And as the regulations that establish the HCBS waiver – Well, I'm not – there's no – is there any document where they've said Section 30 doesn't apply? There is not. Okay. But there is a document that's – Now, if there were one, wouldn't they just be violating the statute if they said  Well, what they have is a document that says to obtain an HCBS waiver, a State must A, B, C, D, E. And the State has done so. So with respect to a question raised by this Court, this case is moot. And it's moot because, as you've noted, the rate – the percentage reductions have expired. The basis for which plaintiffs are seeking preliminary injunctive relief, which, again, is an extraordinary measure, has already been resolved by the State legislature. They're no longer in operation. What about the – they did it voluntarily. Next week they could change it, right? That is a possibility. However, it is not likely. There is no evidence of any such measure. But generally, the mootness law is that a voluntary cessation is not sufficient to moot something. Correct. And – but here, even the purpose of a preliminary injunction is to maintain the status quo. Well, that may go to the preliminary injunction, but it doesn't go to the mootness of the case as a whole. Well, and there – the case is proceeding in the district court, and – but that is not what's in front of this Court. The issue that's in front of this Court with respect to the preliminary injunction, we assert is moot. The basis of the preliminary injunction in terms of maintaining the status quo, here now, before this Court, there is no effective relief that can be provided because you cannot enjoin what is not in existence. And presently, the relief has been provided. The reductions are no longer in play, and moving forward from that point, the district court was correct in affording CMS's approval of the HCBS waiver as determining compliance with the Medicaid Act. And that is a fundamental significant point that we have the Federal agency tasked with the administration, the interpretation, the entire enforcement of the Medicaid Act that has found California's HCBS waiver to be in compliance with the Medicaid Act under managed pharmacy care, as this Court found. Well, in managed pharmacy care, there was information – I've actually gone back and looked at the document that was submitted in managed pharmacy care. It actually has some content to it in terms of Section 30. It wasn't zero. This is zero. And also, the agency's determination was specifically a determination that Section 30 was compliant with. We have neither here. I would respectfully disagree, Your Honor. In this case – Well, you don't disagree because you think Section 30 doesn't have to be compliant. To the extent you're saying that there isn't something here expressly approving of compliance with the Medicaid Act – As to the waiver. As to the waiver. The waiver only being – waiving three sections. That is the point at which I disagree. And the reason why is that the State submitted a 200-plus page application. The contents of that application require analysis on cost neutrality, on utilization of services, on assurances for health and safety of the consumer. There is a plethora of information. In addition to a variety of communications that the State has with CMS to answer any questions that they have. And all of that is before you. But the bottom line is the agency has never said that Section 30 doesn't apply. What the agency has said is that California's waiver – they have approved California's waiver. That approval, as set forth in 430.25g, deems compliance with the Medicaid Act requirements. To the extent that the plaintiffs have – pardon me, that the appellants have any issue with that determination, should be brought with CMS under an APA cause of action. So getting back to the trial court's proper application of managed pharmacy care, deference similarly should be afforded here to CMS's approval of the HCBS waiver. And again, the bottom line is that that approval deems compliance with the Medicaid Act. And as the trial court aptly found, it is inconsequential that managed pharmacy care dealt with a SPA, and in this circumstance we have an HCBS waiver. The unifying thread through both of those is that we have the federal government, again, tasked with the administration and interpretation of the Medicaid Act, that has found California to be in compliance with all Medicaid Act requirements. That is the bottom line. And the trial court aptly afforded Chevron deference to that determination. Moving forward, as the trial court also correctly found, there is no irreparable harm that can be shown absent injunctive relief being provided. Specifically, there is no allegations that there has been any services or supports denied to any consumer under their individual program plan. And this is significant because, to the extent any harm has been alleged, there is an adequate remedy at law that has thoroughly addressed any concerns brought forward by any consumer. In this specific circumstance, we had seven declarations from consumers. There were two that alleged some harm and sought some avenue for their consumer complaints. In this case, the existing remedies through the fair hearing process, through seeking exemptions, through a variety of other mechanisms, has demonstrated that those two specific, for example, those two specific consumers had their concerns addressed at an informal level. The point of this is that there is an existing adequate remedy to the extent any harm is alleged, thereby nullifying the need for any extraordinary injunctive relief. Moreover, as plaintiffs repeatedly said, what they're seeking is prospective injunctive relief. Here, again, going back to the principle of what a preliminary injunction should do is to maintain the status quo. With the reductions being expired, there is nothing for this Court to enjoin. Let's assume for the time being that we, in fact, that the other two provisions are before us and are within the Medicare Act. Okay? So there is something to do unless there's a reason not to. And so then there's the merits issue and then there's the irreparable harm issue as regard to those two other provisions. You keep saying that there's nothing, but there isn't nothing. There's something. In other words, the other two provisions still are in existence, and you're – if we didn't agree with you that they were simply irrelevant, then you would have to account for them. So therefore, it would be useful to account for them in your argument about irreparable harm. Let me add to that, which is that you keep saying you're – we are preserving the status quo, but the status quo would be preserved if a preliminary injunction would issue as to the half-day billing rule and the uniform holiday rule. True. That is true, Your Honor. Okay. So let's address those as Judge Berzon suggested. Assuming that they come within – are we accepting your other argument? So the exact question – I'm sorry, I felt the – the exact question is to tell us why, for the moment, assuming that there is – that the holiday rule and the partial day rule are pertinent to our inquiry, and perhaps assuming that there's a likelihood of success just for purposes of arguing about irreparable harm, how does the irreparable harm play out if we're just – if the percentage cuts are off the table, but the other two are not? Again, I would say, to the extent that there are any allegations of harm relative to those two remaining provisions, then there are existing remedies that would adequately address those concerns. And again, it's unnecessary for any injunctive relief to be provided. Explain specifically on those two. If one wanted to pursue relief, it's go to CMS and seek an APA action? With respect to – herein lies the challenge. Because the – those two measures are not recognized under the Medicaid Act. Okay. But we've asked you to back that up. I understand. But to answer the question of whether an APA action could be brought out with respect to those two, because they are not under the Medicaid Act, that wouldn't be an avenue. Right. So the district court didn't rely on these other avenues of relief, did it? No, it did not. Okay. So – Well, in part, yes – pardon me. Yes, it did. With respect to finding that there is no irreparable harm, the court analyzed at length the declarations as well as the possible consumer avenues that would address those concerns. So you were going to – can I just get an answer to my question? You said there were adequate remedies, and you said, well, it wouldn't be the APA route, which you had mentioned before. So what would be the route? Right. Two separate issues here. The APA would be appropriate to the extent that plaintiffs are – pardon me – that appellants are contesting or taking issue in any way with the approval of the HCBS waiver. Okay. With respect to the remaining provisions, if there is an issue with any provision of services under the Lanterman Act, then a fair hearing can be brought or other – So it's under the Lanterman Act. Correct. Okay. That's all I need. And, again, that is a fundamental point here as well that cannot be underscored enough. Do the providers have a remedy? That's providers. What providers? The providers could bring this point to DDS. There are a variety of mechanisms that DDS can utilize to communicate with providers that if there is an issue, this sort of mean – this sort of – any issue could be addressed. Now – Can I ask one other separate thing? Okay. What about the ADA issue in this case? It's sort of gotten short shrift, and I'm just curious about – the district court thought they were all of the piece. The plaintiffs now say they're not all of the piece. So what do we – what do we do with it? With what? I'm sorry. The ADA issues. The court has clearly made factual findings with respect to the ADA and the RA claims. I thought their only factual – I thought all he said about them was that the only argument that's being made is that there's a discrimination with regard to Section 30, and because he doesn't think Section 30 applies, that loses. So I didn't see anything else that's specific to the ADA. So there are two types of claims. I understand that there are, but the district court did not understand that there were, and he only talked – he only said that. I would also disagree with that, Your Honor. In footnote 3 of the court's decision – so if there – if we were to understand that there are two types of ADA, RA claims, one is the lack of statutory protections under 30A, as well as then the second type of claim deals with the – kind of the impacts of the cuts that have a disproportionate effect on this population. The court in footnote 3 – Footnote 3 of what? Of the preliminary injunction order? Yes. Okay. The court focused on the point of the Lanterman Act providing sufficient protection. In terms of the plaintiff – the appellant's asserting that – That's exactly what I just said, that there's – that this is just the same as the HCBS waiver question. There – there are two types of analysis in the decision. One says that they're unlikely to succeed on the merits for the same reasons that the court analyzed under 30A. The court also addresses the impact – we'll call it the impact argument under ADA. Okay. And it says that because the Lanterman Act in California provides supports and services to individuals regardless of their involvement in the HCBS waiver, these other measures, California has an obligation that they are satisfying to these consumers under the Lanterman Act. So essentially – Isn't that the answer – the question, not the answer? I.e., if they are not satisfying it, if they are, in fact, in the way that it's being administered, not providing the services that would be required under the ADA, then how does the Lanterman Act help? I understand this is an act that says you're supposed to do this, but the claim is you're not doing it. California is uniquely situated. Regardless of what happens to the HCBS waiver, individuals have a right to services and support under their individual program act. That's true, but the claim seems to be they're not getting it. Because of the various cuts. There has been no evidence of that bearing out in the record. Well, I understand. I mean, that's – that may or may not be, but all I'm saying is the district court really didn't address the ADA either – at either version, because all he's saying is essentially it's the same as HCBS, and now you're saying it's the same as the Lanterman Act, but he's not dealing with the question of whether the record would support an MR-like finding on the ADA issue. The district court made several factual findings that would address those concerns. Okay. Where? Specifically, under the irreparable harm analysis, the court goes through in detail the declarations, and in so doing, as I've mentioned already, specifically focuses on the fact that the fair hearing process, for example, resulted in the concerns of the consumers being addressed at an informal level. This shows that there is an adequate remedy that is working. The court also highlights the fact that there has been no exemption sought under either of the reductions when they were in play, that there has been a reduction in institutionalization. But exemptions have to be sought by the regional centers, is that right? I'm sorry, I didn't hear you. Is it right, and I'm not sure about this, but that the regional centers have to seek the exemptions? That's correct, Your Honor. Right. So neither the consumers nor the providers can do it on their own. They would go through the regional centers. Right. And the regional centers don't have to do it. I'm sorry? And the regional centers can just say, no, we're not going to do it. There has been no evidence anyone has even gone to the regional center to seek an exemption. And further, the district court found that the record fully supports there has been, since 2006 to 2012, there has been nearly half, there has been a drop by nearly 50% of those individuals coming out of any sort of the developmental centers and being placed in community-type settings. And this goes directly to any sort of MR-type analysis. Meaning there are more people going to institutions or fewer? Fewer. Okay. Over the course of six years, from 2006 to 2012, the numbers show that populations have dropped by nearly half. Moreover, the information provided regarding any sort of serious injuries has also dropped in the same period of time. The court made several findings. It may not have been explicit to the ADA or RA, but the factual findings are clear that this would support any sort of decision under the ADA showing that the risk of institutionalization is simply not there. Our questions have taken you over your time. Is there any further questions before we return to the plaintiffs? Okay. Thank you, counsel. Thank you. I want to respond to several of those points with respect to the state's position. And I want to bring it back around to look at what the harm really is. Would you mind talking about irreparable harm to start with? Yeah. Because I think, leaving everything aside, that's what you've got to show to get a preliminary injunction not to give relief. Yes, thank you, Your Honor. In terms of the harm, there are several levels of harm that we're talking about in this case. The fundamental harm under federal law and the reason for the injunction is violation of rights of the providers and the consumers under the Medicaid Act by the state's failure to follow 30A, the failure to afford what counsel recalled the statutory protections of 30A to this subgroup within the waiver that they're trying to carve out and treat under a separate framework. That in itself is a violation of rights and is a harm. Okay. Now, the district court, in terms of its irreparable harm analysis as to the two provisions, and I guess probably the other one as well, said, look, the regional centers can seek an exemption for many reduced payments and consumers themselves may invoke a fair hearing process. So why isn't that sufficient to avoid irreparable harm? Neither of those are quite accurate findings. First of all, of the three statutes, the only one that contained an actual exemptions process is the percentage reduction. It had a specific statutory provision that said unless the regional center, not the provider, gets basically permission from the state to pay the increase, to not apply the percentage reduction. The other two, the two that are still in effect, don't have any exemptions process for the regional centers, for the provider, for the consumer, for anybody. The state has fallen back on some sort of a general kind of, well, providers can bring that to the attention of the department, but if that informal mechanism worked, we wouldn't be here. In fact, there is evidence in the record that providers through the regional centers have requested exemptions or did when it was in effect, exemptions from the percentage reduction. That's the declaration of Darla Benson. She eventually was instructed by her regional center, stop making these requests. So I think the record is clear that to the extent there were any other procedures, they're inadequate. Furthermore, it's not the responsibility of the providers or the regional centers to notify the state after the fact that it's inadequately funding the system. The purpose for 30A, the reason why those protections are there, are to compel the state at the outset to ensure that the cuts are not going to threaten the four criteria under Section 30A. Now, if there's also an after-the-fact mechanism to recognize if the state turned out to be wrong, that's great. But in order to comply with 30A, it has to do the analysis at the outset. And so I don't think an appeal, an appeal by a consumer after the fact eliminates or alleviates the state's failure to comply with 30A. But the larger problem is, on irreparable harm, is, assuming for the moment that we're talking just about these two provisions, there – I mean, there is some material in the record saying that this is a significant amount of money. Whether it sufficiently separates them out to say that this is really endangering us as providers or the consumers as consumers, I'm not sure. Well, the – In a preliminary injunction timeframe. And I think we're – Let me ask one preliminary question. The ADA claim has not been dismissed. Is that right? That's correct. Okay. Go ahead. Yes. The ADA-slash-Rehab Act claim is still viable in the district court. We believe the 30A claim should also be reinstated in the district court. I understand that. But you're right that the – I think you used the expression short shrift is what it had been given. And the best that counsel could do is come up with a footnote where the court sort of dismisses that. All right. So let's go to the other question, the one that I raised originally with regard to the other two cuts or changes. Well, and that brings us then to whether there was both the procedural violation of 30A and the substantive harm of inadequate funding resulting in a – So one of your positions is there's irreparable harm because the providers aren't getting this money, are losing money. And they're never going to get it back because of sovereign immunity. Right. And that's a real downer. That's enough by itself under some nice, circular case law. Yes, that's correct. That's correct. The Enmar v. Dreyfus case is a case where this Court, in fact, did consider and it issued an injunction, in fact, under the ADA-Rehab Act theory. And in that case, the Court said that the loss of services resulting from inadequate funding increased the risk of institutionalization. So that also is harm. With respect to the approval issue, I think we're mixing apples and oranges here. Approval of the renewal of the waiver doesn't constitute approval of these three cuts. In order for a cut to be validly enacted, if it's not in the waiver application, which the record is clear it was not, it has to be submitted to CMS through the formal approval process. In the record at page 357, the letter that CMS sent to the State when it renewed the waiver specifically said, if you want to amend or if you want to change anything in this waiver, you can submit a waiver, an amendment application through our online portal. So CMS, to the extent CMS has said anything, it says you need to amend your waiver if you're changing anything. You had an argument in your briefs I didn't understand which relates to this. You said something to the effect of, well, these occurred before they applied for the waiver, so they couldn't have been considered in the waiver, something like that. Well, that gets back to the, and I guess it fits in with the failure in the logical loop that the district court followed, because the only way it could defer to anything is if it considered the renewal, the approval of the renewal to somehow be retroactive validation of the cuts that had been previously made. And I can, related to that, everyone talks, both you and counsel for the State, keep talking about CMS and its role in this. What has its role been in this litigation? Absolutely none. Well, then why is that? That's a good question, Your Honor. I would think that if CMS had an interpretation. Well, did you all go to CMS in any fashion to allege that the State wasn't complying with the Medicaid Act? No, Your Honor. And why not? The, well, the, which also connects, I suppose, to the APA question. In this case, the only action that CMS has taken is to approve the renewal of the waiver. Well, that may be, but. We agree with that. You're saying that you agree CMS is implementing the Medicaid Act under delegation from the Secretary. Correct. So why wouldn't the first order of business go to be, go to the agency that has to approve these things? Hey, guys, do you know what California is doing? It's cutting resources to these home care providers and the like. Right. That's true. So why, I mean, that's a simplistic approach, but why wouldn't that be the first place? No, the plaintiffs, you know, as a couple of statewide organizations representing disability community have had ongoing discussions, but they're not in the record of this case. Well, it's in the record. It comes down to why is this Court in a position to adjudicate what the Medicaid Act means where the agency that's enforcing it and granting these waivers has, in fact, approved the waivers. You're saying that they haven't put forth the information. And it's over a period of time. I mean, these cuts have been enacted in a public session of the legislature. It seems a little strange. The CMS and HHS and whomever else is involved somehow wasn't aware of it and wouldn't have taken action on their own. It does seem strange. In fact, the only reflection in the record of CMS's knowledge is a question that they asked the State in 2011 regarding a 2011 meeting when apparently the percentage reduction came up and the State responded that, oh, yes, we enacted this in 2009 and it's going to sunset next year. And they didn't mention either of the other two cuts. In general in these cases, I mean, there's been a slew of these cases in recent years, and my understanding is, first of all, that CMS and or HHS or anybody else for the government has never shown up as amicus curiae, for example, in any of them. Is that right? Yeah, that's right. And that's left this Court to construe various approvals and nonapprovals as somehow an interpretation from CMS, when I don't think that's necessarily warranted in this case. And it has also not, I mean, except in the formal role of approving or disapproving something submitted to them, hasn't acted on, presumably because they think they can't, on behalf of, with regard to any of these various cuts. Is that accurate? When something is submitted formally as a State plan amendment, they do something. Right. Otherwise, they don't. Right. That's correct. And in this case, the critical and central issue I want to bring us back to, then, is whether or not compliance with 30A is required. That's something that our contention is under the plain language of the Medicaid Act. The only three exemptions under the waiver are those three items. The rest of the Medicaid Act applies, including 30A. And CMS, even if they were to act, don't have the discretion to carve out the waiver. Well, your opponent says then why do they ask all these questions on the waiver? Are they all pertinent to the three provisions, essentially? The ---- Why does CMS ask, CMS ask, require this huge, complicated waiver application? Right. The purpose of the application is, or one of the many purposes, are for the State to demonstrate and represent that it has complied. In the waiver application, in fact, they represent, we will comply with everything we tell you in here, which incorporates the Lanterman Act, and with Medicaid law. And that encompasses 30A, and there's nothing in 30A or any of the Court's long line of decisions that would exempt the waiver. I guess I'm asking you, are the particular questions asked all in some way or other related to the three provisions that are being waived, as to the specific questions that are asked in the waiver? No, they're not. In fact, there is a portion of the application where it talks about are you, in fact, not applying any of those three which you are allowed to waive out of in your plan. But the rest of the 200-plus pages talks about what your payment methodology is and the levels of service you provide, the types of services. And those are not related to the three provisions that are being waived? Presumably they are. No. No, they're not. They're related to, that's how the State demonstrates compliance with the rest of the Medicaid Act. Your time has expired. Thank you very much for your arguments. Thank you both for your arguments. The case has heard will be submitted for decision and will be in recess.
judges: Thomas, Fisher, Berzon